UNITED TEXTILE WORKERS OF
AMERICA, A.F.L. LOCAL 1802
and
United Textile Workers of America,
A.F.L., Plaintiffs,

v.

GOODALL-SANFORD, Inc., Defendant.

Civ. A. No. 4-40.

United States District Court
D. Maine, S. D.

June 1, 1955.

See also 129 F.Supp. 859.

Sidney W. Wernick, Portland, Maine, for plaintiffs.

William B. Mahoney, Daniel T. Drummond, Jr., Portland, Maine, for defendant.

CLIFFORD, District Judge.

This matter comes before this Court upon the motion of the plaintiffs for summary judgment upon that part of their complaint, as amended, in which they request specific performance of the arbitration clauses of a collective bargaining agreement. The plaintiffs instituted their action under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185.

With regard to the aforementioned request for specific performance, this Court is of the opinion that there is no genuine issue of material fact. Briefly, the facts are as follows:

The plaintiff, United Textile Workers of America, A. F. L. Local 1802, and the plaintiff, United Textile Workers of America, A. F. L. are both unincorporated associations and at all times relevant herein, have been labor organizations and trade unions engaged in representing employees for the purposes of collective bargaining. The plaintiffs have been representing, or acting for, employee members of the plaintiff labor

organizations in the State and District of Maine, and, in particular, have been representing and acting for members of the plaintiff organizations who are employees of the defendant corporation, Goodall-Sanford, Inc. They are the sole and exclusive statutory collective bargaining representative of, and agency for, all the production and maintenance employees of the defendant corporation, including working foremen, employed at Sanford and Springvale, Maine.

The defendant corporation, Goodall-Sanford, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of Maine with its principal office and place of business at Sanford, Maine. As of April 5, 1955, it has completely terminated all production operations in its Sanford and Springvale mills and all of the real estate and buildings have been sold. Prior to such termination, however, the defendant corporation was engaged in the business of manufacturing and selling textile products which moved in interstate commerce. Its conduct of said business was such that it affected interstate commerce within the meaning of Federal Laws and, in particular, the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185.

On October 1, 1951, the plaintiff labor organizations and the defendant corporation entered into and executed a collective bargaining agreement which was renewed by the parties thereto on July 29, 1953. As thus renewed, said agreement provided, as to its duration, that the said agreement is to

"continue in full force and effect until July 15, 1955, unless either party gives a notice to modify, 60 days prior to July 15, 1954."

On May 12, 1954, the defendant corporation gave notice of modification to the plaintiff labor organizations as a result of which a supplemental agreement was entered into and executed by the plaintiff and defendant on June 21, 1954. Because of the execution of said supplemental agreement, the defendant corporation withdrew the aforesaid notice of May 12, 1954, with the result that the agreement dated October 1, 1951, as renewed July 29, 1953, and as supplemented by the supplemental agreement executed June 21, 1954, constitutes the entire collective bargaining agreement between the plaintiff labor organizations and defendant corporation. The said collective bargaining agreement provides that it shall continue in full force and effect until July 15, 1955.

Among the provisions of said collective bargaining agreement between the plaintiffs and the defendant are found the following:

Article I—A. Bargaining Unit:

"The Company recognizes the Union as the exclusive collective bargaining agency for all its production and maintenance employees including working-foremen employed at Sanford and Springvale, Maine, in respect to rates of pay, wages, hours, and other conditions of employment. Executives, overseers, second hands, foremen, section hands, guards, and all office workers, laboratory workers, and research workers are not considered production and maintenance employees under this agreement."

Article VI—A–3. Continuous Service:

"Employee's service in an occupation will be continuous except as broken under the provisions of Section E (Transfers) of this Article VI or by termination of his employment under the provisions of Article VII."

Article VII—A. Reasons for Termination:

"An employee's continuous service and his employment with the Company shall be terminated by:

1. Voluntary quit.

2. Discharge for cause.

3. Absence from work for a period of (18) months or more for any reason other than to fill a Union position to which the employee was elected or appointed or where an

entire operation has been discontinued."

Article VIII—B. Arbitration:

"If a satisfactory adjustment is not reached within (10) working days after initiation of conferences in Step 4, any dispute which relates solely to the meaning and application of this Agreement or any individual grievance may be referred to arbitration by written notice by either party to the other. If the written notice is not given within five (5) working days after the completion of Step 4, the grievance shall be considered as settled, and any right to arbitrate waived. Arbitration shall be in accordance with the following procedure:

1. The arbitrator shall be a single arbitrator selected from a panel of three agreed to by the Union and the Company. If the Company and the Union are unable to agree on one of the three, the arbitrator who will first be available for a hearing shall be selected.

2. The Arbitrator shall have no power to add to or subtract from the terms of this Agreement.

3. The Arbitrator's decision shall be in writing and shall be final and binding on the Company and the Union.

4. Awards or settlements of grievances shall be effective as of the date on which the written grievance was first presented, except as otherwise provided by this Agreement, or by mutual consent."

Purpose of Agreement

"It is the intent and purpose of the parties hereto to promote and improve the industrial and economic relations between the Company, its employees, and the Union, and to establish and maintain a basic understanding in relation to rates of pay, hours of work, and other conditions of employment toward full cooperation, good quality of production, and successful operation of the Company's plants."

Article XVI—Waiver

"The parties acknowledge that during the negotiations which resulted in this agreement each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this agreement. Therefore, the Company and the Union, for the life of this agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered in this agreement, or with respect to any subject or matter not specifically referred to or covered in this agreement, even though such subjects or matter may not have been within the knowledge or contemplation of either or both parties at the time that they negotiated or signed this agreement."

Because of continued heavy losses, the defendant corporation decided to terminate all operations at its mills in Sanford and Springvale, Maine, and inaugurated a program of liquidation. On December 29, 1954, the defendant notified approximately 1,136 of its production and maintenance employees, who had theretofore been employed in Mills "A", "B", "C", and the "Printworks" of the defendant corporation, that effective December 29, 1954, their names were being removed from the payroll records of the company and that their respective employment with the company was terminated as of December 29, 1954. On February 18, 1955, the defendant corporation further notified approximately 263 production and maintenance employees of the defendant corporation employed at Sanford, that the employment of each with the defendant was terminated and each employee was advised that his name was

being removed from the payroll records of the company, effective February 18, 1955.

The ground on which the aforesaid notices of termination was based was that owing to the liquidation proceedings in Mills "A", "B", "C", and "Print-works", and the subsequent sale of the mills, the department in which each employee had previously worked had been completely shut down and would not reopen.

On December 30, 1954, by letter signed by Herman Ackroyd, President of United Textile Workers of America, A. F. L., Local 1802, the purported termination by the defendant of the aforesaid approximately 1,136 production and maintenance employees was protested and a meeting of the union representatives with the defendant corporation was requested. Such a meeting was held on January 13, 1955, and, as a result thereof, each of the aforesaid approximately 1,136 employees was notified that the defendant corporation was deferring the effective date of termination, as to such employees, until January 29, 1955. Said employees were further advised that persons who had otherwise qualified for holiday pay on January 1, 1955 would be paid for such holiday pay, and that arrangements had been made for the continuance of group insurance to January 29, 1955, and for the conversion of group life insurance to individual life insurance policies to continue 31 days after January 29, 1955.

On January 31, 1955, by letter bearing said date and signed by the aforesaid Herman Ackroyd in his aforesaid capacity, a further meeting of the defendant corporation and union representatives was requested to decide upon the procedure to be followed in an attempt to resolve the dispute regarding the termination of employees of the defendant.

After the termination notices had been sent, on February 18, 1955, to an additional 263 production and maintenance employees, as set forth aforesaid, by letter of February 23, 1955, signed by the aforesaid Herman Ackroyd in his aforesaid capacity, the plaintiffs notified the defendant that they were requesting arbitration of the dispute, in accordance with the provisions of Section B of Article VIII of the collective bargaining agreement, particular reference being made to the termination notices sent to Mill "B" and Mill "A" employees. In said letter, plaintiffs further submitted the names of three persons, any one of whom the plaintiffs specified would be acceptable to the plaintiffs as an arbitrator. During the last five years when some forty or fifty matters had been submitted by the parties to arbitration, one or the other of the three designated persons had served as an arbitrator, with but two exceptions.

Thereafterwards, on March 2, 1955, a meeting was held between representatives of the plaintiff labor organizations and the defendant corporation with respect not only to the termination notices sent to Mill "B" and "A" employees but also to employees of Mill "C" and of the "Printworks". At this meeting, the plaintiffs were advised by the defendant that the defendant corporation regarded the question of the termination of its employees as a nonarbitrable question under the collective bargaining contract. Accordingly, the defendant corporation refused to submit the dispute concerning the termination of its employees to arbitration. This refusal by the defendant was confirmed in writing, at the request of the plaintiffs, by a letter dated March 8, 1955.

The defendant corporation assigned as the reason for its refusal to submit the termination dispute to arbitration the contention that the collective bargaining agreement between the defendant and the plaintiffs does not cover, and does not attempt to cover, the situation where the defendant terminates its employees because it has completely shut down all or part of its business without possibility of reopening, as a result of continued heavy losses.

The dispute between the parties in this case concerns the right of the defendant corporation to terminate its production

and maintenance employees for a reason, which admittedly is not included among those specified in Article VII—A.

The plaintiffs contend that the terms of Article VI—A-3 and VII—A, as well as other clauses of the collective bargaining agreement, manifest an intention by the parties that the grounds for termination set forth in Article VII—A were intended to be exclusive and limited to those alone. The defendant on the other hand contends that the decision to discontinue all operations of its business and thereby terminate the employment of its employees is a prerogative of management which was not covered nor intended to be covered in the collective bargaining agreement. In other words that the grounds for termination, explicitly written in the agreement are supplemented by the aforementioned prerogative of management.

Whether a dispute is arbitrable depends upon a fair construction of the terms and scope of the collective bargaining agreement. Industrial Trades Union of America v. Woonsocket Dyeing Co., D.C., 122 F.Supp. 872. An analysis of the pertinent provisions of the agreement indicates clearly that the dispute relates to the "meaning and application" of the agreement and that the contentions of the parties in this respect are not frivolous but are fairly and justly maintained and advanced. It is only by an interpretation of the various provisions of the agreement that the dispute may be resolved. This is exactly the type of disagreement which the parties agreed by Article VIII—B was subject to arbitration. It must, therefore, be held that the dispute is arbitrable under the contract. See: Textile Workers Union of America, CIO v. American Thread Company, D.C.1953, 113 F.Supp. 137; Wilson Bros. v. Textile Workers Union, D.C. 1954, 132 F.Supp. 163; Insurance Agents' International Union, A. F. of L. v. Prudential Insurance Co., D.C. 1954, 122 F.Supp. 869; and Local # 379, etc., v. Jacobs Mfg. Co., D.C.1953, 120 F.Supp. 228. Hence, the refusal of the defendant to submit the termination dispute to arbitration, after written request therefor by the plaintiffs, constitutes a breach by the defendant of the collective bargaining agreement in full force and effect between the parties.

A second point raised by the defendant concerns the power of this Court to enforce an arbitration provision in a collective bargaining agreement. It contends that a federal court does not have any authority to grant specific performance of arbitration contracts under Section 301 of Taft-Hartley Act. This Court, however, has already expressed itself in that regard in a matter involving this same lawsuit. United Textile Workers of America A. F. L. Local 1802, v. Goodall-Sanford, Inc., D.C., 129 F.Supp. 859. In that decision, this Court held that it had jurisdiction to afford equitable relief under Section 301 of the Taft-Hartley Act, relying upon the authorities of Milk and Ice Cream Drivers v. Gillespie Milk Prod. Corp., 6 Cir., 203 F.2d 650; Textile Workers Union v. American Thread Co., D.C.Mass., 113 F.Supp. 137; Local 207, etc. v. Landers, Frary & Clark, D.C.Conn., 119 F.Supp. 877; Insurance Agents' International Union v. Prudential Ins. Co., D.C.Pa., 122 F.Supp. 869; The Evening Star Newspaper Co. v. Columbia Typographical Union, D.C.D.Col., 124 F.Supp. 322; Industrial Trades Union v. Woonsocket Dyeing Co., D.C.R.I., 122 F.Supp. 872. On the basis of these cases and particularly Local 207, etc. v. Landers, Frary & Clark, supra and Textile Workers Union v. American Thread Co., supra, this Court may compel arbitration, as provided by the terms of a voluntary contract. Contra: Local 205, United Electrical, Radio and Machine Workers of America, v. General Electric Co., D.C.Mass., 129 F.Supp. 665.

The recent Supreme Court decision of Association of Westinghouse Salaried Employees v. Westinghouse Electric Co., 348 U.S. 437, 75 S.Ct. 488, cited by the defendant in support of its aforementioned contention, is not in point. It held merely that the language of Section 301 is not sufficiently explicit nor its legislative history sufficiently

clear to indicate that Congress intended to authorize a union to enforce in a federal court the uniquely personal right of an employee for whom it had bargained, to receive compensation for services rendered his employer. The case does not clarify the scope of power of federal courts in suits under Section 301 of the Taft-Hartley Act, since there was a 3–2—1–2 split in that regard. Furthermore, this court need not decide whether it has jurisdiction to determine the actual controversy itself because, by deciding that the dispute is arbitrable, that point is not reached. Wilson Bros. v. Textile Workers of America, CIO, supra.

It is, therefore, Ordered, Adjudged and Decreed that the Motion for Summary Judgment with regard to the matter of specific performance of the arbitration clauses of the collective bargaining agreement be, and hereby is, Granted.

Counsel for the plaintiffs is directed to prepare a decree in conformity with the views expressed in this opinion.